PEOPLE ex rel. RYAN v. STURGIS, Fire Com'r.

(Supreme Court, Appellate Division, First Department. June 10, 1904.)

1. MUNICIPAL CORPORATIONS — FIRE DEPARTMENT — EMPLOYÉS — REMOVAL—CHARGES.

An order removing a member of a city fire department after a hearing on charges containing several specifications need not state whether he was found guilty under all of the specifications.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence on the hearing of charges preferred against the chief of construction and repairs to apparatus in the fire department of New York City examined, and *held* sufficient to warrant the employé's removal for negligently or willfully accepting inferior supplies.

3. SAME—SUPERIOR OFFICERS—RELIANCE THEREON BY INFERIORS.

A member of a fire department of a city, required by the rules thereof to certify that supplies procured and work ordered were for the benefit of the department, is justified in relying on the orders of his superiors for supplies and work, unless it is evident that the supplies or work were not for public purposes, in which case he should refuse to make the certificate.

4. SAME—DISOBEDIENCE OF RULES—ACQUIESCENCE.

The failure of a member of a fire department of a city to comply with a rule thereof which has been disregarded for over 30 years is not a cause for his removal, in the absence of directions by the fire commissioner to comply therewith.

5. SAME—USE OF DEPARTMENT PROPERTY FOR PRIVATE USE.

On the charge that a member of a fire department of a city permitted certain property of the department to be taken and kept at a ball ground for

. private use, the evidence showed that certain hose was delivered by the member at such ball ground, pursuant to the order of the chief of the department. There was nothing to show that the member had any reason to believe that the hose was used for a private purpose. *Held* insufficient to prove the charge.

Certiorari by the people, on the relation of Patrick F. Ryan, as chief of the construction and repairs to apparatus in the fire department of the city of New York, against Thomas Sturgis, as fire commissioner, to review the removal of relator. Writ dismissed.

Argued before PATTERSON, HATCH, McLAUGHLIN, INGRAHAM, and LAUGHLIN, JJ.

Delos McCurdy, for appellant.
Terence Farley, for respondent.

LAUGHLIN, J. On the 12th day of August, 1902, charges were duly preferred against the relator, as chief of construction and repairs to apparatus, by the deputy chief of the fire department, of "conduct prejudicial to the good reputation, order, and discipline of the department, and willful neglect of duty." There were 10 specifications of the charges, and they related to the official conduct of the relator from the 1st day of January, 1898, to the 31st day of May, 1902. By the order removing the relator it appears that he was found guilty of the charges; but the order does not state, nor was it essential that it should state, whether or not he was found guilty under all of the specifications. The opinion of the commissioner, however, which is an intelligent review of the case, shows that he exonerated the relator of the charge so far as embraced in the sixth specification, and that he deemed the first three and seventh specifications the most important, and with this view we agree.

The first specification charges the relator with having willfully and knowingly received, accepted, and connived at the acceptance of inferior materials and supplies as a compliance with the requisitions duly made by him for first-class materials and supplies, in violation of sections 214, 216, and 403 of the rules and regulations of the department, and of article 1 of general orders No. 31, promulgated September 14, 1881, and reissued September 19, 1889. The second specification charges that he conspired to defraud the city by making requisitions for supplies and materials of first-class quality, intending corruptly to accept inferior quality in fulfillment thereof. The third specification charges that he willfully and knowingly connived at the payment of exorbitant prices for apparatus, materials, and supplies. These three charges all relate to the same transactions and depend on the same evidence, and may, therefore, be considered together.

The rules and regulations and orders of the department referred to in the specifications, so far as material, will now be stated. Rule 216 provides that a member of the department shall not "be guilty of deception, or evasion of any rule, ordinance, regulation, or order, general, special, or verbal." By rule 403 the relator was made directly responsible to the commissioner for the management of the repair shop, was charged with the control and direction of the employés as·

signed to duty under him; was required to prescribe the duties of all employés engaged in "repairing apparatus, harness, hose," etc., and in building new apparatus, "harness," etc., "as the commissioner may direct"; was required to see that the working time of each employé was correctly kept, and to note and report all derelictions of duty or incompetency, and to see that their time was "employed to the greatest advantage"; was required to cause to be opened and kept a double entry account, in which the amount and cost value of all the labor, supplies, and materials expended in the erection, building, repairing, or alteration of every apparatus of each company, and of the spare apparatus, and of the tools, implements, harness, hose, and all articles of outfit or equipment furnished with each, should be entered at the time of the expenditure or issue, "and in such manner that the cost value of each job of work done for, or of articles issued to, each company, or spare apparatus, as well as the aggregate cost value of the same, shall be clearly shown to any required day," and the date of construction or purchase of each apparatus and of all hose, and the companies or battalions to which it has been delivered, with the time of delivery. This rule further provided that "all materials, tools, supplies," etc., "required for use at the repair shops, or elsewhere in the department, under the direction of the officer in charge," should be obtained by the relator from the purchasing agent upon requisition. The general rule referred to in the specifications made the relator responsible "for machinery, tools, materials, harness, wagons, supplies," etc., "in the repair shops, or in his use or possession elsewhere, also all office furniture."

Although in the main the apparatus was purchased ready for use, yet some apparatus and parts of apparatus were manufactured in the repair shop, and nearly all of the repairs were made there. The work done in the repair shop was quite extensive, upwards of 60 men being employed in performing it. A large quantity of oak, ash, and hickory was used in the construction and repair work. Requisitions were made by the relator from time to time for the quantity of these different kinds of material needed, and in all instances first-class, second-growth, white material, "to be selected," was specified. Upon the requisition being approved by the commissioner, the duty of purchasing the material rested upon the purchasing agent, who was an independent official in no manner subordinate to the relator. Contracts for the purchase of the material in accordance with the requisitions were made by the purchasing agent. Quite a volume of testimony was given upon the hearing with reference to the quality of the material received and accepted at the repair shops in fulfillment of these contracts. Although the rule is not definite concerning the inspection of material, it is manifest that it was the duty of the relator to do this, or see that it was done; and he appears to have understood that this was his duty. The relator testified that when material was required he sent one of his employés, a wheelwright, to select the material in the lumber yard of the contractor who was to furnish it, or from which it was to be furnished, and that he also directed this wheelwright to inspect the material as it was tendered for delivery at the shop. He says that he himself was an iron worker,

and not a lumber expert. The wheelwright, upon whom the relator claims to have devolved this duty, testified that he selected the material in the yards and generally inspected the material when it arrived. According to custom, the relator certified upon each invoice of material received that "the goods had been received in good order and condition, correct as to weight, measure, and amount, and all for the exclusive use of the department"; and then the purchasing agent made a certificate to the same effect, and also to the effect that the prices charged were just and reasonable, and that the purchase had been duly authorized. In each instance there was, pursuant to this custom, a further certificate by the ralator, as foreman of the repair shops, as follows:

"I certify that the articles above are necessary for the proper equipment of this shop, and necessary to maintain it in serviceable condition."

The testimony of mechanics, wheelwrights, painters, and carpenters in the employ of the department at the repair shop at the time the material was received, most of whom are still so employed, testify that in the main the material received and accepted, and which they were required to use in the construction and repair work, did not conform to the requisitions, in that it was not first quality material and was unsuitable for use in the department. A carriage maker, familiar with the nature and quality of wood, who examined the material in stock at the repair shop, on the occasion of a visit for that purpose, which was received and accepted during the relator's term of office, testified in substance that some of the material was good, very much of it poor, and none of it first-class. In behalf of the relator several experts were called, who visited the shop and examined the material found there at the time of their visit, and they testified that most of it was first-class. It is unnecessary to review this testimony in detail. The fact was fairly established by satisfactory evidence that the bulk of the material received and accepted as a compliance with these requisitions and with the contracts made thereunder was not of the quality required by the requisitions, but of an inferior quality and unfit for the use for which it was designed. The inspection seems to have been rather superficial. Everything presented was generally accepted. Many of the employés required to use this material in the construction and repair work frequently complained to their foreman that it was unfit for the purpose desired. These complaints received little or no consideration. The material was not returned, but was used, with the result that often repaired apparatus or appliances were soon returned to the shop on account of the bad quality of the material thus employed in previous repairs. In one instance one of the employés, according to his testimony, upon receiving no satisfaction from the foreman, complained to the relator, who, however, denied that any complaint was made to him concerning the quality of the material.

However this may be, the conclusion from all the evidence is irresistible that the relator must have been familiar, if not with the complaints, at least with the character of the material, or that he was willfully negligent in the performance of his duty. He had

charge of the shop, the employés, the work they were doing, and of the material, which must have been frequently observed by him, and the quality of which it was his duty to ascertain before certifying the correctness of the invoices. He knew that the lives and limbs of the firemen and of the people whom it might be their duty to rescue, as well as the saving of property, were dependent upon the safety of the apparatus and appliances which were being constructed or repaired under his supervision. He also knew that the city was paying high as a condition of obtaining first-class selected material. He was, therefore, required to exercise a high degree of diligence in seeing that the material received and used in this construction and repair work were of the quality called for by his requisitions. He appears to have been intelligent and competent. If he realized this responsibility, as we think probable, the only explanation of his conduct is either that he willfully neglected his duty to avoid displeasing some other official, or that he acted corruptly and was personally benefited by the transaction. It is inconceivable that he would have allowed the acceptance and use of material, the major part of which did not conform to his requisitions and was wholly unfit for the construction and repairs of apparatus and appliances, and rendered the same, not only unreliable, but unsafe, and would have thus aided in increasing the profits of the contractors at the expense of the city, unless he was acting under restraint, or received or expected to receive some personal benefit thereby; and, so far as the determination of the questions now presented is concerned, it is immaterial which.

The seventh specification, which the commissioner deemed important and established by the evidence, charges that the relator willfully and knowingly allowed his subordinates to make false entries in the books of the repair shops with reference to the working time of the employés, and did knowingly connive at and allow the payment to employés for overtime for work that had not been performed or that was unnecessary, in violation of the rules and regulations of the department to which reference has been made. The evidence tends to show that in a few instances the entries with reference to the time that some of the employés worked was slightly erroneous; but we are of opinion that this was through mistake, rather than by design. In many instances the time taken by the members of the wrecking gang in performing work outside the shops was grossly excessive, and they were, but should not have been, fully allowed therefor. It appears to have been a well-settled practice in the department, so general as to be designated the rule, although no formal rule to that effect was shown, that in case of an accident or other emergency the employés might be employed overtime, both between and after working hours and on holidays; and for such services they received double pay. The evidence shows that in many instances a number of the employés were employed overtime and paid at the increased rate for doing work that was not emergent work. This practice appears to have prevailed quite generally toward the close of each year. The relator concedes that some of the work upon which the men were thus employed was not emergency work;

but he denies that he knew at the time that the men were employed overtime on any work other than emergency work, except toward the close of the year, pursuant to a custom and with the consent of the commissioner. The principal work upon which the men were thus employed overtime was the construction of the various kinds of wheels used in the department. The relator does not claim that there was an immediate pressing demand for more wheels at all times when the men were employed overtime at such work. He defends their employment upon such work upon the ground that he was over-strict with reference to the disbursements for wages during the principal part of the year to insure keeping within the appropriation, and that when, toward the close of the year, it was evident that there would be a surplus, he, pursuant to custom and with the consent of the commissioner, allowed the men to work overtime on this class of work to be prepared for the demand that would naturally arise during the winter season for extra wheels, owing to the more frequent and harder use of the apparatus and appliances during that season. The slowness with which this overtime work was performed indicates, however, that even the urgency the relator claims for it did not exist, and tends to support the contention on the part of the respondent that much of this overtime was ordered to favor the employés who were benefited thereby. The evidence also indicates that the relator did not have a proper system with reference to ascertaining the overtime work. The overtime of the wrecking gang in performing services outside the shop was entered and certified principally upon the report of the men themselves, without very much investigation, and they seem to have taken advantage of this loose system, and to have been very liberal to themselves. There was no protection against either mistakes or fraud. In view of the express duty devolved upon the relator by the rule with reference to keeping correct records of the time for which the men were employed, he should have exercised a more careful supervision of the overtime work, should have limited it strictly to emergency work, and should have remedied the loose methods for ascertaining and crediting the time the men were employed.

The fourth and fifth specifications relate to the performance of work in the repair shop, and the use of materials for private purposes, and to entries in the books concerning the same. The position of the relator with reference to these matters was embarrassing. The work was ordered by his superior officers. If he refused to comply with their directions, or even questioned the propriety of doing the work at the public expense, it is evident that this would have led to friction, if not to his discharge. Some of the work manifestly could not have been for the benefit of the department, but was for the benefit of the superior officers in his individual capacity. In the main, however, the work thus ordered might have been for the benefit of the department. The responsibility for the work thus ordered that might have been for the benefit of the department should rest upon the superior officer, and not upon the relator; but the work that manifestly could not have been for the department he should have refused to perform, even though it might have resulted in the loss

of his position.   He was required to certify that the materials and supplies of which he was the custodian were used for the benefit of the department, and that the time of the men, whose salaries or wages the city paid, was employed in the performance of public services.   This enjoined upon him the duty of using reasonable care to ascertain that the work was for the benefit of the department. Where, as has been observed, it might have been for the benefit of the department, and he had no reason to believe that it was not, perhaps he would have been justified in relying upon the orders of his superior; but where it was evident that the work was not for public purposes, or he had reasonable cause to believe that it was not, he should have refused to perform it.

The eighth specification charges that the relator did not demand and receive receipts for apparatus, appliances, and supplies delivered from the repair shop to the different companies and battalions. There appears to have been a rule requiring such receipts at the time of delivery; but it had not been observed for about 30 years.   The system in actual use was to obtain these receipts at the expiration of each period of 6 months.   The ninth specification charges that the relator failed to keep complete records as required by rule 403. The evidence relating to this specification shows that he did not require the accounts to be kept in such form as to show the cost of each piece of work performed or to show a separate account with each company.   These failures to comply with the rule are admitted by the relator; but he testifies that the rule had never been observed, so far as he knew, that the clerical force was inadequate to comply therewith, and that, in his judgment, the great expense incident to a compliance with the rule would not be warranted.   It was the duty of the relator to comply with these rules, and, if the clerical force was insufficient, he should have applied for an increase; but, in the circumstances, his failure, and a like failure on the part of his predecessors, to observe the rules in these particulars, was known and acquiesced in such a long period that the commissioner should have drawn attention to the rules and required their enforcement, and would not have been warranted in removing the relator for nonobservance thereof before directions to comply therewith.

The tenth specification charges that the relator knowingly and willfully permitted and allowed certain property belonging to the department to be taken and kept at the ball ground at 158th street and Eighth avenue for private use.   The evidence relating to this specification shows that certain hose was delivered by the relator at the ball ground pursuant to an order from the chief of the department. There was nothing to show that the relator had any reason to believe that this hose was not to be used for public purposes.   He would not have been justified in refusing to comply with the direction of his superior in this regard, and, therefore, he is not guilty under this specification.

It was not necessary, in order to justify the removal of the relator, to show that he was guilty under every specification of the charge. It was sufficient to show that he was guilty of the charge under some

specification fairly embracing it. As has been seen, the evidence fairly showed that he was guilty of the charge under some of the specifications.

It therefore follows that the proceedings should be affirmed, and the writ dismissed, with costs. All concur.